UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MANUEL A. BENAVIDEZ,                    §
                                        §
            Plaintiff                   §
                                        §
V.                                      §
                                        §
THE CITY OF IRVING, TEXAS and           §
HERBERT A. GEARS, THOMAS D.             §       CIVIL ACTION NO. 3:07 CV 1850-P
SPINK, ELIZABETH (BETH) VAN             §
DUYNE, ALLAN E. MEAGHER, LEWIS          §
PATRICK ROSE CANNADAY, RICK             §
STOPPER, SAM SMITH, and JOE             §
PHILIPP, in their official capacities,  §
                                        §
            Defendants                  §

## DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE
## TO MOTION FOR SUMMARY JUDGMENT

**I.**     **To be able to satisfy the first prong of the *Gingles* test, the plaintiff must be able to show that it is possible to draw a reasonably compact district with a Hispanic citizen-voting-age population majority. The district proposed by the plaintiff that contains his residence is neither reasonable nor compact.**

The plaintiff's primary response to the motion for summary judgment is his assertion that

it is, indeed, possible to draw a Hispanic citizen-voting-age population majority district that

includes the plaintiff's residence. That is not enough, however, to satisfy the first *Gingles*

threshold requirement. The district must be reasonably compact. More precisely, the plaintiff

must be part of a reasonably compact minority group that is sufficiently numerous to constitute a

majority in a single-member district. Neither the district the plaintiff has presented nor any

group of Hispanic adult citizens that contains the plaintiff and is sufficiently numerous to

constitute a majority in a single-member district is reasonably compact. Thus, the plaintiff has

not and cannot show the individual harm necessary to establish his standing to bring this suit.

A.    **Compactness is an essential element of the *Gingles* threshold analysis.**

The first prong of the *Gingles* threshold analysis is expressly stated in terms of geographic compactness. *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986) ("sufficiently large and geographically compact to constitute a majority in a single-member district").  Compactness is an essential element of establishing a violation under section 2 of the Voting Rights Act.  The Supreme Court in *Gingles* explained that if the minority group is scattered throughout the jurisdiction—*i.e.*, if it is not compact—then the use of an at-large system is not the source of any injury. *Gingles*, 478 U.S. at 50, n.17.  Or, as stated in subsequent Supreme Court opinions, even if it is possible to draw a district that contains a majority of the plaintiff group, unless the district defining the group is compact, there "neither has been a wrong nor can be a remedy." *Shaw v. Hunt,* 517 U.S. 899, 916 (1996), *quoting, Growe v. Emison*, 507 U.S. 25, 41 (1993).  Thus, the Supreme Court, when looking at the 12th congressional district in North Carolina, concluded that "no one looking at [that district] could reasonably suggest that the district contains a 'geographically compact' population of any race."  Because there was an absence of compactness, there was no Section 2 violation. *Shaw v. Hunt*, 517 U.S. at 916.

North Carolina District 12



Similarly, when the State of Texas joined two groups of Hispanics—one in Hidalgo County and the other in Travis County—by connecting them with a bridge of seven relatively sparsely populated counties, the Court found the district, even though not nearly so attenuated as the North Carolina district, was not reasonably compact and thus did not meet the *Gingles* test even though the district contained enough Hispanic voters to ensure it could elect a candidate of Hispanic choice. *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 424, 435 (2006) ("*LULAC*").

Texas Congressional District 25

Travis County



Hidalgo County

There can be no doubt that the district Mr. Ely has drawn in this case to include the plaintiff's residence, and which is shown below, is far from compact.



**Plaintiff's
Illustrative Plan C**

The ultimate question is whether the minority group itself is compact. *LULAC*, 548 U.S. at 433 ("The first *Gingles* condition refers to the compactness of the minority population, not to the compactness of the contested district"). The inquiry into compactness should consider "traditional districting principles such as maintaining communities of interest and traditional boundaries." *Id.* at 433, *quoting Abrams v. Johnson*, 521 U.S. 74, 92 (1997), *quoting, Vera,* 517 U.S. at 977 (plurality opinion). Because the compactness inquiry embraces these traditional districting principles and rejects the assumption that voters will share the same political interests merely because they share the same race or ethnic identity, a district that "'reaches out to grab small and apparently isolated minority communities' is not reasonably compact." *LULAC*, 548 U.S. at 433, *quoting, Vera,* 517 U.S. at 979.

Of course, that is exactly what Mr. Ely has done here. He has reached out to grab Mr. Benavidez' residence. Specifically, he extended the eastern edge of the district about one and a quarter miles to the south and then went about three miles to the west across largely unpopulated area until he reached Mr. Benavidez' home. Pl. App. 51-52, ¶¶ 4-5; 67; 71. Indeed, the bottom half of the district, with its drop to the south and lunge to the west, exists solely to reach out to bring Mr. Benavidez and as few other people as possible into the district. Pl. App. 52, ¶ 5; *compare* Pl. App. 67 *with* Pl. App. 71. While the Supreme Court speaks of reaching out to incorporate an isolated minority community as defeating compactness, here Mr. Ely is bringing a geographically isolated individual into the district, an action that is even less conducive to establishing compactness.

Under the teaching of the Supreme Court in *LULAC* and its antecedents, there can be no doubt that Mr. Ely has not drawn a relatively compact district or shown that the plaintiff is part of a geographically compact and sufficiently numerous group of adult Hispanic citizens. Even if such a group exists in Irving, Mr. Benavidez, because of the location of his residence, is not part of it. Accordingly, he has not personally suffered a cognizable injury under section 2 of the Voting Rights Act.

**B.      Although Mr. Ely claims the district he drew is "within the range of compactness found in single member districts in Texas," his statement has no basis in fact since none of the districts he included have been found to be compact.**

The plaintiff addresses the compactness requirement only fleetingly in his response to the motion for summary judgment. Specifically, Mr. Ely, the plaintiff's expert, states in his declaration that:

> In my experience, districts are often extended in unexpected ways to include particular locations, such as incumbent residences, key supporters' residences, or community facilities. Illustrative District C, as well as other

illustrative districts I have created, is within the range of compactness found in single member districts in Texas.  Attached as Exhibit 5 is a series of maps of current or recently used legislative districts.

Pl. App. 52, ¶ 7.

To the extent that Mr. Ely suggests that there has been any judicial or other official finding that the districts included in his appendix are compact, that is incorrect.  No court has made a finding that any of the districts set out at pages 75–78 of the plaintiff's appendix are compact.  The closest the courts have come to commenting on the compactness of the districts set out in the plaintiff's appendix involves the Sixth Congressional District found on page 75 of the appendix.  Justice Stevens noted that that district was ranked "among the oddest in the Nation" and there is little doubt that he considered it to be exceedingly non-compact.  *Vera*, 517 U.S. at 1019 (Stevens, J., dissenting).  Indeed, no one can look at any of those districts—or, for that matter, at the district drawn by Mr. Ely to include the plaintiff's residence—and say that it is compact.

A district cannot be considered to be compact simply because it is equal to or perhaps better than the least compact single-member districts in the state.  Texas legislative and congressional districts are not generally required by state or federal law to be compact and sometimes they are not.  *See LULAC*, 548 U.S. at 430 ("To be sure, § 2 [of the Voting Rights Act] does not forbid the creation of a noncompact majority-minority district").  Compactness is a legal issue in two situations.  First, there is the *Gingles* standard under section 2 of the Voting Rights Act, which is the issue in this case, where a plaintiff must establish there is a reasonably compact and sufficiently numerous group of minority citizen-voting-age population to constitute a majority in a single-member district.  If there is a section 2 violation, a remedial district must incorporate that compact population.  Second, compactness is a factor to consider when

determining if race was the predominant factor behind the drawing of district boundaries. This is a consideration in equal protection, racial gerrymandering claims brought under the theory set out in *Shaw v. Reno*, 509 U.S. 630 (1993). Except in these two situations, Texas districts are not legally required to be compact. Since they were not required to be compact and have not been found to be compact, there is no basis in law or logic to support the plaintiff's assertion that because these districts were adopted by the Texas Legislature or the Legislative Redistricting Board that they establish some minimal standard of compactness.

**II.      The plaintiff's argument that he would have standing even if he lived outside a potential district ignores well-established Supreme Court voting rights law.**

The plaintiff's second argument is that he would have standing even if he resided outside the boundaries of any possible district. While the plaintiff sets out theoretical types of harm that Mr. Benavidez might suffer, he entirely ignores the Supreme Court opinions that specifically explain the injury that is addressed by section 2 of the Voting Rights Act.

The plaintiff's argument at least implicitly assumes that if a minority group has difficulty electing the representative of its choice under an at-large election system, then the protection afforded by the Voting Rights Act extends to all members of that group. It does not. *Shaw v. Hunt*, 517 U.S. at 917. The right provided by the Act is to cast an undiluted vote, and that right belongs to individuals and not to the group as a whole. *Id.* Thus, the plaintiff may not bootstrap standing on the alleged injury suffered by others in the city. Only his personal injury is relevant to the standing inquiry.

When formulating the *Gingles* threshold test, the Supreme Court noted that it was only where minority voters were geographically concentrated that the use of the at-large system resulted in dilution. *Gingles*, 478 U.S. at 50, n.17. Where minority voters' residences are integrated throughout the jurisdiction—and Mr. Benavidez' residence falls in that category—

"the at-large system cannot be blamed for the defeat of minority-supported candidates." *Id.* Outside the geographically compact area of minority voters, "there neither has been a wrong nor can be a remedy." *Shaw v. Hunt*, 517 U.S. at 916, *quoting, Growe*, 507 U.S. at 41. Since Mr. Benavidez resides outside any geographically compact area of minority voters he has not suffered a wrong within the contemplation of section 2 of the Voting Rights Act and thus he has no standing.

In both *Shaw v. Hunt* and *LULAC* the Supreme Court considered a situation where there was a geographically compact area of minority voters but the Legislature chose to draw a majority-minority district somewhere else. In each case, the Supreme Court determined that the harm under section 2 of the Voting Rights Act was experienced by the geographically compact group of minority voters and that a district drawn elsewhere, even though it might be a district that could elect the minority voters' choice of candidates, would not address the section 2 violation. *LULAC*, 548 U.S. at 429-35; *Shaw v. Hunt*, 517 U.S. at 917. In *LULAC*, for example, the Court did not question that the non-compact District 25, which stretched from McAllen to Austin, was a Hispanic-majority district and would elect the candidate of Hispanic choice. *LULAC*, 548 U.S. at 434-35. On the other hand, the former District 23, which included Laredo, defined a reasonably geographically compact group of Hispanic voters. The Court concluded that the creation of a district for those without a section 2 right [*i.e.,* District 25] could not compensate for the failure to create a district for those with a section 2 right [*i.e.,* residents of the former District 23]. *Id.* at 430-31. The Hispanics who resided outside the geographically compact area of Hispanic voters had no section 2 right because they had suffered no section 2 harm. Because they had suffered no legally cognizable harm, they had no standing.

That is exactly the situation here.  Mr. Benavidez is not part of a reasonably compact group of citizen-voting-age Hispanics.  Just as the Hispanic residents of District 25 in *LULAC* did not suffer section 2 harm because of the absence of geographic compactness, so, too, does Mr. Benavidez not suffer harm that is legally cognizable under section 2.  In the absence of such harm there is an absence of standing.

The plaintiff's effort to find injury in the inability to work for or contribute to Hispanic candidates, even though they may represent a different area of the city, is similarly unavailing. Conspicuous by its absence in plaintiff's discussion of this point is the citation of any authority. This is not surprising as the city is unaware of any court that has discussed section 2 harm and standing in this context.  To the contrary, *Gingles* expressly set out the threshold elements necessary to establish harm under section 2 and to link that harm to the use of the at-large system.  *Gingles*, 478 U.S. at 50, n.17.  That harm is a personal harm, not a group harm.  *Shaw v. Hunt*, 517 U.S. at 917.  The harm does not exist in the absence of a geographically compact group of minority voters.  *Id*. at 916.  Since Mr. Benavidez does not reside in that geographically compact area of Hispanic voters, he has not experienced any harm within the contemplation of section 2, and, thus, he has no standing.  *LULAC*, 548 U.S. at 430-31.

## CONCLUSION

Mr. Benavidez does not meet the Supreme Court's test of how a plaintiff establishes injury and links that injury to the use of an at-large system.  Because he cannot show that he has suffered personal injury under that test, he has no standing to maintain this suit, and the cause should be dismissed.

Respectfully submitted,

CHARLES R. ANDERSON
City Attorney
State Bar No. 01170500
CITY OF IRVING, TEXAS
825 W. Irving Boulevard
Irving, Texas 75060
Telephone:  972-721-2541
Facsimile:  972-721-2750

BICKERSTAFF HEATH
DELGADO ACOSTA LLP
816 Congress Avenue, Suite 1700
Austin, Texas  78701-2443
Telephone:  (512) 472-8021
Facsimile:  (512) 320-5638

By:  ___/s/ C. Robert Heath_____
       C. ROBERT HEATH
       State Bar No. 09347500

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

      I hereby certify that a true and correct copy of the foregoing document was served on the following via electronic transmission and United States mail, certified, return receipt requested, on this the _____ day of January, 2009 as follows:

Michael Veeser
William A. Brewer III
Michael L. Smith
Bickel & Brewer Storefront, P.L.L.C.
1717 Main Street, Suite 4800
Dallas, Texas 75201
E-mail:  MCV@bickelbrewer.com

/s/ C. Robert Heath_____
C. ROBERT HEATH